1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

LINDA MCNEIL,

11

Plaintiff,

CASE NO. 11-cv-5827-BHS-JRC

12

v.

REPORT AND
RECOMMENDATION ON
PLAINTIFF'S COMPLAINT

13

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

14

Noting Date: September 14, 2012

15

Defendant.

16

17

This matter has been referred to United States Magistrate Judge J. Richard

18

Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR

19

4(a)(4), and as authorized by *Mathews, Secretary of H.E.W. v. Weber*, 423 U.S. 261,

20

271-72 (1976).  This matter has been fully briefed (*see* ECF Nos. 14, 15, 16).

21

Here, the ALJ rejected the opinions from a doctor who examined plaintiff on

22

multiple occasions without providing specific and legitimate reasons for rejecting these

23

opinions. Instead, the ALJ credited the conclusory opinion of a non-examining doctor,

24

who demonstrated an incomplete knowledge of the record. Therefore, the medical

evidence was not evaluated properly and this matter should be reversed and remanded

pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration.

BACKGROUND

Plaintiff, LINDA MCNEIL, was fifty-one years old on her date of amended

alleged disability onset of June 11, 2007 (*see* Tr. 13, 117). In July, 2007, plaintiff was

approved for Medicaid based on her need for thyroid surgery (*see* Tr. 242, 358-

60).Plaintiff's preoperative diagnosis was hyperparathyroidism, and her postoperative

diagnosis was the "Same, with a double adenoma" (*see* Tr. 358). On July 13, 2007, Dr.

John A. Ryan, Jr. M.D. wrote a letter to plaintiff's medical treatment provider in which

he indicated that the surgery team was "happy to find that she had the rare double

adenoma" (*see* Tr. 356-57). He also was "happy to report in the recovery room her

parathyroid hormone which ha[d] been 102 preoperatively, fell to a level of 10, [which]

almost always signifies cure" (*see* Tr. 356).

Plaintiff allegedly also had "wasting in her lower extremities, combined with

obesity, left peroneal neuropathy and low back and hip pain," among other issues (*see*

Opening Brief, ECF No. 14, p. 21). In May, 2007, plaintiff weighed 154 pounds and had

a body mass index ("BMI") of 29.4 (*see* Tr. 216; *see also*, *e.g.*,

http://www.nhlbisupport.com/bmi/). On this occasion, and consistently, plaintiff's height

was measured at 5'00.7" (*see* Tr. 216, 219, 225).

The ALJ found plaintiff to be obese with a BMI "that had been greater than 30,"

noting that the National Institute of Health's "<u>Clinical Guidelines</u> describe a BMI of 25-

29.9 as 'overweight' and a BMI of 30.0 or above as 'obesity'" (*see* Tr. 20; *see also*, *e.g.*, http://www.nhlbisupport.com/bmi/). As found by the ALJ, plaintiff had at least the severe impairments of hyperparathyroidism; transient ischemic attack (TIA); right hip osteoarthritis; obesity; diabetes mellitus (DM); depression; and anxiety (*see* Tr. 15).

Plaintiff had part-time work during the relevant period of time, however the ALJ found that plaintiff's part-time work at a tanning salon was not substantial gainful activity (*see id.*). Although plaintiff has a history of drug addiction and alcoholism, she entered treatment in August, 2007 (*see* Tr. 17). The ALJ found that regarding plaintiff's brief relapse with "alcohol in September 2008, [plaintiff] was noted to be in remission in September 2009" (Tr. 17 (internal citations to Exhibit 19F1, 5)). The ALJ noted that plaintiff "graduated from her intensive outpatient program in November 2009 (internal citation to Exhibit 20F1)" and found that plaintiff's "history of polysubstance dependence [wa]s a non-severe impairment" (*id.*).

It appears that the first primary care records following plaintiff's thyroid surgery are from February, 2008, at which time plaintiff reported suffering from depression; polysubstance abuse in remission; possible sleep apnea; possible restless leg syndrome; COPD (chronic obstructive pulmonary disease); hypertension; and "multiple other issues" (Tr. 524). On this occasion, plaintiff reported that switching to Effexor from Paxil had resulted in increased energy and mood (*id.*). Her depression was assessed as improving (*id.* ("feeling great")). Plaintiff's primary complaint at this time was restless leg syndrome and resultant sleep interference (*id.*).

On March 20, 2008, Advanced Registered Nurse Practitioner Peggy Oberg ("Nurse Oberg") evaluated plaintiff again (*see* Tr. 523). She noted that plaintiff had fallen "off the wagon on Thursday [and] her last drink was Friday" (*id.*). Nurse Oberg noted that plaintiff "did detox via the ER with the addition of Ativan" (*id.*). She also noted that plaintiff weighed 172 pounds at that time and had a BMI of 32 (*id.*). Although obesity was not included in the assessments as a specific diagnosis, Nurse Oberg indicated in her plan the "pathophysiology of truncal obesity, increased triglyceride levels and current symptoms" (*id.*).

On May 7, 2008, Nurse Oberg again evaluated plaintiff (Tr. 522). Nurse Oberg indicated that plaintiff appeared to have been crying, which plaintiff confirmed (*id.*). Plaintiff reported that her sleep issues were aided by the use of Trazadone (*id.*). Nurse Oberg evaluated plaintiff's metabolic test results and diagnosed metabolic syndrome (*id.*). Nurse Oberg indicated her objective observation of significant muscle wasting in plaintiff's extremities (*id.*).

Dr. Donald L. Sharman, M.D. ("Dr. Sharman") examined plaintiff on September 17, 2008 and opined that she had underlying depression with anxiety and insomnia; osteopenia; and other diagnoses (*see* Tr. 519-20). He also diagnosed plaintiff with metabolic syndrome, said diagnosis appearing to be the first such diagnosis from an acceptable medical source (*see* Tr. 519). Dr. Sharman also examined plaintiff on October 7, 2008 (*see* Tr. 518). On this occasion, plaintiff's chief complaint was back and leg pain (*id.*). Dr. Sharman observed on examination that plaintiff has "absent Achilles reflexes" (*id.*). At this time, Dr. Sharman indicated his assessment that plaintiff's low back pain

and left hip pain "may be sciatica or osteoarthritis of lumbar spine or hip" (*id.*). He also indicated an assessment as follows: "Bilateral lower extremity peripheral neuropathy with absent Achilles reflexes suggesting peripheral neuropathy, may be related to alcohol but consider other, could be radicular problem with lumbar spine disease" (*id.*). He indicated his plan that plaintiff obtain nerve conduction tests of both lower extremities (*id.*).

On May 7, 2009, Dr. Sharman indicated that plaintiff's x-ray results indicated osteoarthritis in her right hip, with mild degenerative changes (*see* Tr. 515). He again indicated his plan for nerve conduction studies (Tr. 516). Plaintiff's nerve conduction study indicated the need for her doctor to consider "moderate left peroneal neuropathy at the ankle or proximally such as at the fibular head;" left L5 radiculopathy; and sensory polyneuropathy (*see* Tr. 530; *see also* Tr. 527-31).

## PROCEDURAL HISTORY

On June 11, 2007, plaintiff protectively filed an application for supplemental security income alleging disability beginning October 1, 2006, subsequently amended to June 11, 2007 (*see* Tr. 13, 117-20). Her application was denied initially and following reconsideration (*see* Tr. 73-79). Her requested hearing was held before Administrative Law Judge Donald J. Willy ("the ALJ") on November 12, 2009 (Tr. 33-70). On December 9, 2009, the ALJ issued a written decision in which he found that plaintiff was not disabled pursuant to the Social Security Act (*see* Tr. 10-26).

On August 10, 2011, the Appeals Council denied plaintiff's request for review, making the written decision by the ALJ the final agency decision subject to judicial review (Tr. 1-3). *See* 20 C.F.R. § 404.981. In October, 2011, plaintiff filed a complaint in

1   this Court seeking judicial review of the ALJ's written decision (*see* ECF Nos. 1, 3).

2   Defendant filed the sealed administrative record ("Tr.") on January 24, 2012 (*see* ECF

3   Nos. 9, 10). In her Opening Brief, plaintiff challenges the ALJ's review of (1) medical

4   evidence provided by examining doctor, Dr. Norma Brown, Ph.D.; (2) lay evidence

5   provided by Ms. Donna L. Schwan, plaintiff's friend who has shared living space with

6   plaintiff (*see* Tr. 571-76).; and (3) evidence regarding plaintiff's residual functional

7   capacity, especially alleged significant probative evidence regarding "neuropathy

8   established by nerve conduction study and observations of muscle wasting, in

9   combination with severe obesity and right hip osteoarthritis" (*see* ECF No. 14, pp. 1-2).

10

11                 <u>STANDARD OF REVIEW</u>

12        Plaintiff bears the burden of proving disability within the meaning of the Social

13   Security Act (hereinafter "the Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.

14   1999); *see also Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). The Act defines

15   disability as the "inability to engage in any substantial gainful activity" due to a physical

16   or mental impairment "which can be expected to result in death or which has lasted, or

17   can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

18   §§ 423(d)(1)(A), 1382c(a)(3)(A).  Plaintiff is disabled under the Act only if plaintiff's

19   impairments are of such severity that plaintiff is unable to do previous work, and cannot,

20   considering the plaintiff's age, education, and work experience, engage in any other

21   substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A),

22   1382c(a)(3)(B); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

23

24

1    Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's

2    denial of social security benefits if the ALJ's findings are based on legal error or not

3    supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d

4    1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

5    1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is

6    such "'relevant evidence as a reasonable mind might accept as adequate to support a

7    conclusion.'" *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (*quoting Davis v.

8    Heckler*, 868 F.2d 323, 325-26 (9th Cir. 1989)); *see also Richardson v. Perales*, 402 U.S.

9    389, 401 (1971). Regarding the question of whether or not substantial evidence supports

10   the findings by the ALJ, the Court should "'review the administrative record as a whole,

11   weighing both the evidence that supports and that which detracts from the ALJ's

12   conclusion.'" *Sandgathe v. Chater*, 108 F.3d 978, 980 (1996) (per curiam) (*quoting

13   Andrews, supra*, 53 F.3d at 1039). In addition, the Court "'must independently determine

14   whether the Commissioner's decision is (1) free of legal error and (2) is supported by

15   substantial evidence.'" *See Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2006) (*citing

16   Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)); *Smolen v.

17   Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

18        According to the Ninth Circuit, "[l]ong-standing principles of administrative law

19   require us to review the ALJ's decision based on the reasoning and actual findings

20   offered by the ALJ - - not *post hoc* rationalizations that attempt to intuit what the

21   adjudicator may have been thinking." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1226-27

22   (9th Cir. 2009) (*citing SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947) (other citation

omitted)); *see also Molina v. Astrue*, 2012 U.S. App. LEXIS 6570 at *42 (9th Cir. April

2, 2012) (Dock. No. 10-16578); *Stout v. Commissioner of Soc. Sec.*, 454 F.3d 1050, 1054

(9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the agency

did not invoke in making its decision") (citations omitted). In the context of social

security appeals, legal errors committed by the ALJ may be considered harmless where

the error is irrelevant to the ultimate disability conclusion when considering the record as

a whole. *Molina, supra*, 2012 U.S. App. LEXIS 6570 at *24-*26, *32-*36, *45-*46; *see

also* 28 U.S.C. § 2111; *Shinsheki v. Sanders*, 556 U.S. 396, 407 (2009); *Stout, supra*, 454

F.3d at 1054-55.

<u>DISCUSSION</u>

1. <u>The ALJ failed to evaluate properly medical evidence provided by examining</u>

    <u>doctor, Dr. Norma Brown, Ph.D. ("Dr. Brown").</u>

The ALJ must provide "clear and convincing" reasons for rejecting the

uncontradicted opinion of either a treating or examining physician or psychologist.

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (*citing Baxter v. Sullivan*, 923 F.2d

1391, 1396 (9th Cir. 1991); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990)). Even if

a treating or examining physician's opinion is contradicted, that opinion "can only be

rejected for specific and legitimate reasons that are supported by substantial evidence in

the record." *Lester, supra*, 81 F.3d at 830-31 (*citing Andrews v. Shalala*, 53 F.3d 1035,

1043 (9th Cir. 1995)). The ALJ can accomplish this by "setting out a detailed and

thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings." *Reddick, supra*, 157 F.3d at 725 (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

In addition, the ALJ must explain why his own interpretations, rather than those of the doctors, are correct. *Reddick, supra*, 157 F.3d at 725 (*citing Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss *all* evidence presented." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam). The ALJ must only explain why "significant probative evidence has been rejected." *Id.* (*quoting Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981)).

An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." *Lester, supra*, 81 F.3d at 830 (citations omitted); *see also* 20 C.F.R. § 404.1527(d). A non-examining physician's or psychologist's opinion may not constitute substantial evidence by itself sufficient to justify the rejection of an opinion by an examining physician or psychologist. *Lester, supra*, 81 F.3d at 831 (citations omitted). However, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." *Tonapetyan, supra*, 242 F.3d at 1149 (*citing Magallanes, supra*, 881 F.2d at 752). "In order to discount the opinion of an examining physician in favor of the opinion of a nonexamining medical advisor, the ALJ must set forth specific, *legitimate* reasons that are supported by substantial evidence in the record." *Van Nguyen v. Chater*, 100 F.3d 1462, 1466 (9th Cir. 1996) (*citing Lester, supra*, 81 F.3d at 831); *see also* 20 C.F.R. § 404.1527(d)(2)(i).

Dr. Brown examined plaintiff on multiple occasions and specifically indicated her assessment regarding plaintiff's functional limitations on June 28, 2007 (Tr. 295-308);

April 21, 2008 (see Tr. 435-53); and March 5, 2009 (Tr. 420-33). On June 28, 2007, Dr. Brown indicated that plaintiff was "totally confused" when she attempted the trail making test ("TMT") (*see* Tr. 295), a fact demonstrated by a review of plaintiff's errors (*see* Tr. 308; *see also* Tr. 307). Dr. Brown also indicated that plaintiff's judgment and problem solving skills were "poor" and that she demonstrated memory and concentration errors (*see* Tr. 302; *see also, e.g.,* Tr. 301 (below average digit span)). Plaintiff exhibited no eye contact at this evaluation and presented as depressed and crying (*see* Tr. 301). Dr. Brown diagnosed plaintiff with depressive disorder NOS; anxiety disorder, NOS; polysubstance dependence; and a deferred diagnosis of maladaptive behavior of personality disorder with dependent traits (*see* Tr. 296). The deferred diagnosis, however, is supported by evidence from plaintiff's friend, who noted that plaintiff "always needs help in making plans to do things because she needs others' input to decide or she leaves it up to others" (Tr. 574). Dr. Brown indicated her opinion of multiple cognitive areas in which plaintiff suffered from marked degree of limitation in her ability to work; and multiple social areas in which plaintiff suffered from marked limitation or severe limitation in her ability to work (*see* Tr. 297).

Plaintiff was examined by Dr. Brown again in April, 2008 and Dr. Brown indicated specifically that there was "no evidence of malingering" (Tr. 435). Plaintiff presented as anxious, worried and paranoid, and again demonstrated memory and concentration errors (*see* Tr. 441 ("Impaired" digit span)). Her ability for abstract thought was questioned, based on her explanations of common sayings (*see* Tr. 441 (don't cry

over spilled milk "cause you can clean it up" and people who live in glass houses should not throw stones because "they'll bust their house")).

Dr. Brown also indicated that plaintiff had numerous errors in her trail making test ("TMT"), and then just quit (*see* Tr. 435; *see also* Tr. 449, 451). In addition, plaintiff was not able to complete a particular three-step task correctly, described as follows: "Listen carefully because I am going to ask you to do something. Take this paper in your right hand [pause], fold it in half [pause] and put it on the floor" (*see* Tr. 444).

Based on this result and plaintiff's other mental status examination ("MSE") results, Dr. Brown opined that plaintiff suffered from marked limitations on her ability to understand, remember and follow complex (more than two step) instructions; on her ability to learn new tasks; and on her ability to perform routine tasks (*see* Tr. 437). Dr. Brown also opined that plaintiff suffered from multiple marked and severe limitations in her social abilities with respect to a work setting (*id.*). Dr. Brown indicated that plaintiff continued to be cognitively impaired, was very confused on her TMT and demonstrated a short term memory impairment (Tr. 437).

On March 5, 2009, plaintiff presented very tense and her affect was labile, as she was tearful and cried easily (*see* Tr. 425). In contrast to both of her previous results, on this occasion, plaintiff demonstrated normal times on her TMT, although she still exhibited an error (*see* Tr. 430). Regarding concentration tests, plaintiff exhibited errors; her performance was slowed and effortful; and Dr. Brown indicated that plaintiff's results were not within normal limits (*see* Tr. 426). As with previous MSEs, plaintiff

demonstrated poor insight (*see* Tr. 426; *see also* Tr. 301, 441). Dr. Brown indicated that plaintiff could be distracted and that she made errors due to distractibility (*see* Tr. 422).

Although the three step task that plaintiff did not complete entirely at her earlier appointment with Dr. Brown does not appear to have been tested on this subsequent occasion, Dr. Brown noted plaintiff's report that when she tried to make macaroni, she poured out the boiling water before she added the pasta and that she may have washed clothes without soap (*see* Tr. 426; *see also* Tr. 444). The Court notes that the lay evidence supports this possibility (*see* Tr. 571 (plaintiff leaves laundry in washer for days, forgets to hang up phone)). The Court notes that the lay evidence also supports Dr. Brown's observations and opinion regarding short term memory, errors on concentration tests, and poor insight (*see* Tr. 422, 426, 574 ("yes she can watch a show or read a book but if you ask her about it after, she was not as focused as one may have thought she was and has info. scrambled")).

Dr. Brown again indicated her opinion that plaintiff suffered from multiple areas of marked limitation in her cognitive ability to work, such as marked limitation in her ability to understand, remember and follow complex (more than two step) instructions (Tr. 422). She also indicated again her opinion that plaintiff suffered from marked limitation in her social ability to relate to co-workers and supervisors at work and severe limitations in her ability to respond appropriately to and tolerate the pressure and expectations of a normal work environment (*id.*).

The ALJ rejected Dr. Brown's opinions, for example, finding that plaintiff had only moderate limitation in her ability to understand, remember and carry out complex

instructions (*see* Tr. 21). On every occasion on which Dr. Brown indicated her opinion

regarding plaintiff's ability to work, however, she opined that plaintiff suffered from

marked limitation in her ability to understand, remember and follow complex instructions

(*see* Tr. 297, 422, 437). As discussed, this opinion was supported in part by the plaintiff's

failure to complete correctly a three step task entailing taking a piece of paper in her right

hand, folding it in half and putting it on the floor (*see* Tr. 444). The records from Dr.

Brown do not indicate that plaintiff repeated this test or ever completed this three-step

task correctly.

The ALJ found that plaintiff suffered from moderate limitation in her ability to

respond appropriately to usual work situations (*see* Tr. 21). However, Dr. Brown opined

on multiple occasions that plaintiff suffered from severe limitation in this area (*see* Tr.

297, 422, 437). This degree of limitation is the greatest degree of severity that an

evaluator can report on these forms (*see id.*).

The ALJ relied on an opinion from a non-examining doctor, Dr. Glen McClure,

Ph.D. ("Dr. McClure"), to support the failure to credit fully the opinions of examining

psychologist, Dr. Brown (*see* Tr. 24). Even if the opinions of an examining doctor are

contradicted, the ALJ must provide "specific and legitimate reasons that are supported by

substantial evidence in the record" in order to reject them properly. *See Lester, supra*, 81

F.3d at 830-31 (*citing Andrews*, *supra*, 53 F.3d at 1043); *see also Van Nguyen*, *supra*,

100 F.3d at 1466. The reason provided by the ALJ here was that "Dr. McClure testified

that the limitations set forth by Dr. Brown are not supported by the rest of the medical

records, and do not 'fit' with the 'entire picture'" (Tr. 24).

1       First, based on a review of Dr. McClure's testimony, it does not appear that Dr.

2   McClure was familiar sufficiently with Dr. Brown's functional evaluations (*see* Tr. 54-

3   64). When discussing plaintiff's degree of limitation regarding pace and persistence, Dr.

4   McClure reviewed only plaintiff's most recent trail making test ("TMT"), which was the

5   only one on which her performance was within normal limits (*see* Tr. 56, 427-30). He

6   indicated awareness only of one of the other results on plaintiff's TMT (*see* Tr.

7   63).Regarding plaintiff's ability to perform complex tasks (more than two-step tasks), Dr.

8   McClure opined that plaintiff suffered from only moderate limitations (*see* Tr. 58).

9   However, when doing so, Dr. McClure failed to mention that plaintiff was unable to

10  complete correctly a three step task entailing taking a piece of paper in her right hand,

11  folding it in half and putting it on the floor (*see* Tr. 444). More importantly, Dr. McClure

12  demonstrated that he was unaware of these test results (*see* Tr. 63-64). When asked by

13  plaintiff's attorney why he disagreed with all of the assessments by the examining doctor,

14  who spent an hour with plaintiff on each occasion, Dr. McClure indicated that the only

15  documentation demonstrating any deficit was "that one Trails [TMT] [] done back in

16  2007" (*see* Tr. 63-64). Other than "that one Trails," Dr. McClure opined that he had "no

17  documents, zero deficit and no neuro[testing] or cognitive testing that support, you know,

18  a deficit in that area" (*id.*).

19      The Court already has discussed many deficits demonstrated in test results that

20  were performed by Dr. Brown during her mental status examinations, such as the ones

21  supported by lay evidence regarding short term memory, concentration limitations and

22  poor insight (*see* Tr. 422, 426, 441, 574; *see also* Tr. 301-02). The fact that Dr. McClure

REPORT AND RECOMMENDATION ON
PLAINTIFF'S COMPLAINT - 14

did not examine plaintiff and appeared to find only one documented neurological or

cognitive test supporting a greater degree of limitation than as he found to exist suggests

that Dr. McClure did not have a sufficiently thorough understanding of plaintiff's

medical record.

The Court also notes that Dr. McClure indicated that he did not know if he

disagreed with the opinions of any of the doctors in the file (*see* Tr. 59). In addition, Dr.

McClure indicated that the record may have been ambiguous and in need of further

objective testing (*see* Tr. 63). The ALJ appears to have relied on an opinion from a non-

examining doctor who found the record to be ambiguous in order to reject the opinion

from an examining doctor who spent more time with plaintiff and conducted multiple

MSEs.

The Court furthermore notes that the phrase "rest of the medical records" does not

provide any indication of any particular aspect of the medical record that is inconsistent

with or not supported by Dr. Browns' opinions regarding plaintiff's functional limitations

(*see id.*). Any error in lack of specificity is not cured by the subsequent characterization

by the ALJ of the consultant's opinion that Dr. Brown's opinions do not fit with the

"entire picture" (*see* Tr. 60-64).

Based on a review of the entire record, including Dr. Brown's opinions, and Dr.

McClure's testimony, the Court concludes that, in this context, the ALJ's findings

regarding the examining doctor that his opinions were "not supported by the rest of the

medical records," and did not "'fit' with the 'entire picture,'" is not a specific and

legitimate reason to discount those opinions (Tr. 24). *See Lester, supra*, 81 F.3d at 830-31 (*citing Andrews*, *supra*, 53 F.3d at 1043); *see also Van Nguyen*, *supra*, 100 F.3d at 1466.

The Court also concludes that this is not harmless error. The vocational expert testified that if Dr. Brown's opinions were credited fully, specifically her opinion that plaintiff suffered from marked limitation, a "'very significant interference with basic work related activities in the areas of the ability to respond appropriately to and tolerate the pressures and expectation of a normal work setting,' that [such] would eliminate all competitive employment" (*see* Tr. 69). For this reason, this matter should be reversed and remanded to the Commissioner for further administrative proceedings.

2.   <u>The lay evidence should be evaluated anew following remand of this matter</u>.

Pursuant to the relevant federal regulations, in addition to "acceptable medical sources," that is, sources "who can provide evidence to establish an impairment," *see* 20 C.F.R. § 404.1513 (a), there are "other sources," such as friends and family members, who are defined as "other non-medical sources," *see* 20 C.F.R. § 404.1513 (d)(4), and "other sources" such as nurse practitioners and chiropractors, who are considered other medical sources, *see* 20 C.F.R. § 404.1513 (d)(1). *See also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010) (*citing* 20 C.F.R. § 404.1513(a), (d)); Social Security Ruling "SSR" 06-3p, 2006 SSR LEXIS 5, 2006 WL 2329939. An ALJ may disregard opinion evidence provided by "other sources," characterized by the Ninth Circuit as lay testimony, "if the ALJ 'gives reasons germane to each witness for doing so." *Turner, supra*, 613 F.3d at 1224 (*citing Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.

1    2001)). This is because "[i]n determining whether a claimant is disabled, an ALJ must

2    consider lay witness testimony concerning a claimant's ability to work." *Stout v.*

3    *Commissioner*, *Social Security Administration*, 454 F.3d 1050, 1053 (9th Cir. 2006)

4    (*citing Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).

5         The Ninth Circuit has characterized lay witness testimony as "competent

6    evidence," noting that an ALJ may not discredit "lay testimony as not supported by

7    medical evidence in the record." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009)

8    (*quoting Van Nguyen, supra*, 100 F.3d at 1467) (*citing Smolen v. Chater*, 80 F.3d 1273,

9    1289 (9th Cir. 1996)). In addition, testimony from "other non-medical sources," such as

10   friends and family members, *see* 20 C.F.R. § 404.1513 (d)(4), may not be disregarded

11   simply because of their relationship to the claimant or because of any potential financial

12   interest in the claimant's disability benefits. *Valentine v. Comm'r SSA,* 574 F.3d 685, 694

13   (9th Cir. 2009).

14        The ALJ failed to credit fully the lay evidence provided by Ms. Donna L. Schwan

15   ("Ms. Schwan"), plaintiff's friend who resided with her when she made her observations

16   (*see* Tr. 24-25). The ALJ found that "several portions" of Ms. Schwan's statement were

17   inconsistent with the objective medical record (*see* Tr. 24). However, the ALJ specified

18   only one example of alleged inconsistency: "Ms. Schwan notes that the claimant has a

19   hard time doing dishes, and has difficulty standing (internal citation to Exhibit 21F1).

20   However, the claimant previously indicated that she can do dishes, and she reported no

21   standing limitation (internal citation to exhibit 1E4, 7)" (Tr. 24-25).

1    The Court notes that on one of the pages cited by the ALJ, plaintiff indicates that

2    she can do dishes, along with other household chores, but, regarding how long it took her

3    to conduct her household chores, she indicated specifically that "I always sit and rest so it

4    takes a couple of hours" (*see* Tr. 127). This is not entirely inconsistent with Ms.

5    Schwan's statement.  Additionally, the Court notes that plaintiff failed to indicate that her

6    impairments affected her standing ability on one section of this report (*see* Tr. 130).

7    Because this matter must be remanded, the lay evidence should be evaluated anew

8    following remand of this matter.

9         3.   When making the determination regarding plaintiff's residual functional

10             capacity ("RFC") on remand, the ALJ should evaluate explicitly plaintiff's

11             ability to stand, in the context of evidence regarding plaintiff's neuropathy as

12             indicated by the nerve conduction study and observations of muscle wasting, as

13             well as evidence regarding severe obesity and right hip osteoarthritis.

14    The ALJ mentioned some of the evidence discussed by the Court already, *see*

15    BACKGROUND, including plaintiff's hip x-ray showing mild joint space narrowing in

16    plaintiff's right hip, her absent Achilles reflexes, and the nerve conduction study

17    indicating moderate left peroneal neuropathy (*see* Tr. 518, 530, 536). However, the ALJ

18    made no specific findings regarding plaintiff' ability to walk, despite this evidence, and

19    other evidence suggesting limitations in that area. Instead, the ALJ found, without further

20    discussion, that plaintiff was capable of performing light work, which requires "the

21    ability to do substantially" a good deal of walking or standing (*see* Tr. 21). *See* 20 C.F.R.

22    § 416.967(b). Following remand of this matter, plaintiff's ability to walk and stand

should be evaluated explicitly when plaintiff's RFC is determined, as should any significant, probative evidence that is rejected. *See Vincent*, *supra*, 739 F.2d at 1394-95 (*quoting Cotter*, *supra*, 642 F.2d at 706-07) (an ALJ must explain why "significant probative evidence has been rejected").

<u>CONCLUSION</u>

The ALJ improperly relied on a conclusory opinion from a non-examining doctor in order to reject opinions from an examining doctor. The ALJ failed to provide specific and legitimate reasons for his failure to credit fully the examining doctor's opinions.

Based on these reasons and the relevant record, the undersigned recommends that this matter be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further consideration. **JUDGMENT** should be for **PLAINTIFF** and the case should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **September 14, 2012**, as noted in the caption.

Dated this 23rd day of August, 2012.

J. Richard Creatura
United States Magistrate Judge